Broadbent *v.* A. Moe & Company, Inc., Appellant.

Argued March 23, 1966. Before ERVIN, P. J., WRIGHT, WATKINS, MONTGOMERY, JACOBS, HOFFMAN, and SPAULDING, JJ.

*George J. McConchie*, with him *Cramp & D'Iorio*, for appellant.

*John T. Mulligan*, with him *Lord & Mulligan*, for appellees.

OPINION BY MONTGOMERY, J., June 17, 1966:

This appeal is from the grant of a new trial in an action of assumpsit brought to recover the value of a marine compressor leased by plaintiffs-appellees to the defendant-appellant and not returned. A jury trial resulted in a verdict for the defendant. A new trial was granted on the grounds that the verdict was against the weight of the evidence and the charge of the court.

The facts are generally undisputed. Defendant, a marine contractor, orally rented the compressor from plaintiffs on September 20, 1963, for an indefinite period and placed it on a barge owned by another contractor. Both defendant and this third party were working under River Associates, the general contractor, in the construction of a boat landing platform at a United States Coast Guard lighthouse and weather station in Delaware Bay. The barge had been inspected in dry-dock and properly outfitted in accordance with the United States Coast Guard safety requirements

shortly before this incident. On September 29, 1963, between six and eight a.m., while it was securely lashed to the deck of the barge which was moored three miles from shore and within hailing distance (150 yards) of the manned United States Coast Guard lighthouse and weather station, the compressor was swept overboard with a large derrick and a quantity of other equipment and gear during a storm which ripped off the deck of the barge rendering it a total loss. During the week end of September 29, 1963, there was a watchman on the barge who was employed by the owner of same and not by defendant. The watchman was also swept overboard at about the same time and lost his life.

The trial proceeded by plaintiffs proving the lease, the delivery of the compressor and the failure of defendant to return it. Defendant then proved the loss of the compressor in the manner hereinbefore set forth. The plaintiffs then offered evidence to establish negligence on the part of the defendant. Much of the evidence was contained in a report of the United States Coast Guard following an investigation made by it into the cause of death of the watchman, the admissibility of which is in dispute. Plaintiffs also offered "Marine Forecast and Warnings" issued for Delaware Bay during this period by the United States Weather Bureau and certain answers made by defendant to interrogatories which plaintiffs submitted to it.

Plaintiffs contended that defendant was negligent in failing to acquaint itself with available weather forecasts and to act thereon in protecting its compressor, and that the watchman was negligent in permitting water to get into the hull of the barge and also in permitting the bilge pump by which water was pumped from the hull to become wet and inoperable. Plaintiffs also contended that defendant was responsible for the watchman's negligence. The jury, however, found for the defendant, from which it may be reasonably con-

cluded that plaintiffs failed to prove any acts of negligence for which the defendant was responsible and therefore failed to meet their burden of proof. *Huck-Gerhardt Company, Inc. v. Kendall,* 189 Pa. Superior Ct. 126, 149 A. 2d 169 (1959); *Schell v. Miller North Broad Storage Company, Inc.,* 142 Pa. Superior Ct. 293, 16 A. 2d 680 (1940).

Before considering the issue relating to the weight of the evidence we must first decide the preliminary issue as to the admissibility of the report of the United States Coast Guard covering the death of the watchman. This report was produced at pretrial by counsel for the defendant when and where it was agreed by both counsel for plaintiffs and defendant that it was admissible into evidence without formal proof "subject to proof of relevancy". It was marked "Defendant's Exhibit No. I". The report consisted of (1) a transcript of testimony taken from two seamen who were in the lighthouse during the morning watch when the loss occurred and the log of their activities during the preceding night; (2) a finding of facts made by the Commandant, the official in charge of the investigation; and (3) a summary of those findings. The offer of the report in evidence was objected to for the reason that it was too "general" and "hearsay" and therefore not relevant or competent. The court overruled the objection and permitted the entire report to be read into evidence as "Plaintiffs' Exhibit No. 3". Unless the pretrial agreement of counsel is sufficient to justify this action the admission of the report into evidence was error. Reports of investigations are hearsay unless expressly authorized by law. *Wentworth v. Doliner,* 399 Pa. 356, 160 A. 2d 562 (1960); *Johnson v. Peoples Cab Company,* 386 Pa. 513, 126 A. 2d 720 (1956); 14 P.L.E., Evidence, §133. Our attention has not been directed to any law giving particular significance to such reports of investigations by the United

States Coast Guard or to make them an exception to the hearsay rule. Even under the Uniform Business Records as Evidence Act of May 4, 1939, P. L. 42, 28 P.S. §91a et seq., such reports are not admissible. *Haas v. Kasnot*, 371 Pa. 580, 92 A. 2d 171 (1952). Furthermore, that act does not make competent such matters contained in records covered by the act which are otherwise violative of evidentiary rules. *Henderson v. Zubik*, 390 Pa. 521, 136 A. 2d 124 (1957).

Our examination of the report clearly indicates it was entirely hearsay and for that reason generally inadmissible. However, it was produced by the defendant at pretrial as its exhibit and since it was agreed that it was to be admissible in evidence without formal proof, subject to relevancy, we must consider the effect of such agreement. We have no trouble ruling out as irrelevant the finding of facts made by the Commandant and the summary of those findings with his conclusions. The primary object of a trial is to bring to the tribunal which is passing on the dispute those persons who have within their knowledge the facts to which they testify. The Commandant had no personal knowledge of such facts and therefore anything he said or found was irrelevant and should have been eliminated even under the agreement.

However, the testimony given at the United States Coast Guard hearing by the seamen was relevant and material since the seamen who gave that testimony saw those things about which they testified. Although their testimony given out of court and not under oath would be considered hearsay, its incompetency for that reason may be and was waived. *Schade v. Milk Control Commission*, 196 Pa. Superior Ct. 14, 173 A. 2d 647 (1961). Such was the case here. Defendant agreed to the admissibility of any part of the report that was relevant and in surrebuttal offered parts of it into evidence.

All of the report has not been printed in the record submitted to us and much of this refers to the watchman's efforts to save himself. We shall, therefore, quote only that part of the seamen's testimony which reflects on the defendant. In answer to the question, "On the 29th of September 1963, . . . tell . . . what you actually saw . . ." The seaman replied: ". . . I had the watch from mid to eight. At about 7:20 . . . I observed . . . a lifeboat tied on the east side of the barge. About seven o'clock was the first sign of life I saw over there in the morning, . . . at 7:20, it looked to me like he was trying to lower the lifeboat . . . As I observed, the boat broke loose . . . He waved his arms like there was nothing he could do about it, and I came back inside. I observed that the east side of the barge was very low in the water, and about 7:25 or 7:30 he was back there trying to start a bilge pump, which it had rained all night and he had no success in trying to start it . . . I imagine it was wet . . . The hole or the hatch where they had the pipe running down into the water for suction was open all night, and the seas I observed were breaking over the stern, or I should say that end of the barge, and as it was low on that side all the water would run that way. Also, it had been raining most of the night, and about 7:40 I called Cape May by radio and reported that the barge was going down and that shortly thereafter I also reported that the man was in the water. I told the O.D. that I'd put my boat in the water, and I told him the sea conditions here, the wind and the weather, and I was informed at 7:45 by the O.D. at Cape May not to put my boat—my small boat over the side, due to the sea conditions. I told him that I didn't believe I could even get it in the water."

That part of the report offered by the defendant in surrebuttal consisted of the seamen's log during the night and early morning before the wreck. It

showed he had hourly "timed the lights" and checked with Cape May by radio, the only items of significance being that at 7:00 a.m. he timed the main light and reported to Cape May that the "lifeboat from barge adrift, man on barge all right. 7:23, secured No. 2 generator and main light. 7:40, reported to Cape May that barge was going down, man in water, man had a life jacket on. 7:45, told by Cape May . . . not to put our small boat . . . over the side due to wind and sea. 7:50, relieved of the watch by another seaman."

This is the only evidence to show neglect on the part of the watchman. Without deciding the question of whether his negligence, if any, was imputable to this defendant we are satisfied that it was not of such great weight as to overcome the verdict of the jury. At best much of it is conjectural. The seaman imagined that the pump became wet and rendered useless. Furthermore, there is nothing to show that an open hatch such as he described could have been responsible for the filling of the hull of so large a barge as to accommodate a large derrick and other equipment, nor is there any evidence of the amount of rainfall, how long the sea broke over the side or end of the barge, or the severity of the storm at this point. The jury refused to accept this evidence to establish negligence on the part of the watchman, and it is understandable since the severity of the storm which tore off the deck and swept a large derrick and other equipment overboard might have been the sole cause.

The other negligence charged to the defendant is its neglect to advise itself of weather conditions and to move the barge to a safe mooring in the face of a pending storm. Whether or not defendant took precautions to advise itself of the weather is also a disputed question. The plaintiffs offered certain answers made by defendant to their interrogatories, one of which was to the question whether or not the defendant had made

any effort to acquaint itself with weather conditions prevailing at that point during the 24 hours before the air compressor was lost. The answer to that question was as follows, ". . . For the entire twenty-four hours and at sundown Saturday, September 28 the weather was reported clear and calm and the forecast was that this condition would continue." Plaintiffs offered another answer to a question whether any efforts had been made to move the barge to a safe mooring, viz.: "No efforts were made to move the barge on September 29 because there was no known need to move it. . . . We are unable to state that there was any reasonable time during which rescue efforts of the barge and other equipment could have been attempted. The watchman aboard the barge was drowned in his attempts to reach safety at the U. S. Coast Guard Light House Station within 150 yards of the barge. The Coast Guard personnel on board the station were unable to make successful rescue attempts. We understand that the situation was due to the suddenness and severity of the storm."

In conflict with these answers plaintiffs offered as an exhibit "Marine Forecasts and Warnings issued for Delaware Bay on September 28, 29, 1963, on file in the U. S. Weather Bureau." This report is different from the reports issued by the United States Coast Guard on which reliance is generally placed by marine people. The Weather Bureau whose report was offered in evidence was located at the International Airport in Philadelphia, Pennsylvania, fifty miles away from where the barge was moored. This report advised that on Saturday, September 28 at 11:00 a.m., there would be westerly winds at 10 knots an hour increasing to 25 knots an hour early Sunday, with cloudiness followed by rain. A similar report was issued at 5:10 p.m. and again at 11:10 p.m. on Saturday. These latter reports indicated the wind would increase to 15 to 25 knots late Saturday night and 20 to 30 knots on Sunday. Tides were

reported as one to three feet above normal Sunday with *possible minor* flooding at high tide. It was not until 5:10 a.m. Sunday morning that small craft warnings were displayed.

Whether this record be viewed as defendant answered to interrogatories, that no warnings indicating danger were issued, or from the other viewpoint that such warnings as disclosed by the Weather Bureau report were issued and available and should have been known by defendant at the barge, or at its place of business in Delaware County, Pennsylvania, the conclusion of the lower court that the weight of the evidence was in plaintiffs' favor was entirely unjustified.

If it was the practice to rely on the United States Coast Guard forecasts and no danger was indicated, there was no duty on the part of the defendant to do more than it did. On the other hand, if the warning as given by the Weather Bureau should have been known and relied on by defendant, it was not so clear as to indicate any risk or danger to the barge. Only minor disturbances were indicated, such as a one to three foot rise in tide above normal, minor flooding in that case and such wind velocity as to indicate danger only to small craft at the time of the last report, 5:10 on Sunday morning. Even if this last warning to small craft was sufficient to dictate action on the part of defendant at this time, it was too late to take action. The evidence is that under normal conditions it would have taken over six hours to tow the barge from the bay to a safe mooring.

We conclude that it was an abuse of discretion and erroneous for the lower court to set aside this verdict on the basis of it being against the weight of the evidence. It may have been against the charge of the court which was not proper since it came close to being a directed verdict for the plaintiffs. However erroneous such charge was, since it was prejudicial to de-

fendant it need not be considered. The verdict was for the defendant and was fully supported by the evidence. It should not have been set aside.

The order granting a new trial is reversed and the verdict in defendant's favor is reinstated, with directions to the lower court to enter judgment thereon upon payment of proper costs.